IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CRIMINAL NO. | 1:CR-08-007 |
|---|---|---|---|
| v. | : | | |
| DENNIS CAMPBELL | : | | |

| UNITED STATES OF AMERICA | : | CRIMINAL NO. | 1:CR-08-129 |
|---|---|---|---|
| v. | : | | |
| TIMOTHY G. HUBLER | : | | |

| UNITED STATES OF AMERICA | : | CRIMINAL NOS. | 1:CR-08-318 |
|---|---|---|---|
| | : | | 1:CR-08-465 |
| v. | : | | |
| ROMEO P. CRUZ | : | | |

## **M E M O R A N D U M**

Before the court are Defendants' objections to the Government's loss calculations in these separately filed yet factually related cases. On June 22, 2010, the court held an evidentiary hearing on the amount of the loss attributable to the Defendants' conduct. For the reasons that follow, the court will overrule Defendants' objections.

## I. Background

At all relevant times, Defendant Dennis F. Campbell was employed as a vice-president of Schuylkill Products, Inc., ("SPI"), which until the time it was sold in April 2009, was a business based in Cressona, Pennsylvania, that manufactured prestressed concrete bridge beams for use on highway construction projects.

At all relevant times, Defendant Timothy G. Hubler was employed as a vice-president of CDS Engineers, Inc., ("CDS"), which was a wholly-owned subsidiary of SPI operating out of the SPI facility, and functioned as the engineering and erection division of SPI, installing SPI beams, as well as non-SPI products at various job sites inside and outside of Pennsylvania.

At all relevant times, Defendant Romeo P. Cruz was the owner and president of Marikina Construction Corporation and Marikina Engineers and Construction Corporation (collectively "Marikina"), which was a small Connecticut-based certified disadvantaged business enterprise ("DBE").

A DBE is a for-profit small business that is at least 51% owned by one or more socially and economically disadvantaged individuals, and whose management and daily business operations are controlled by at least one of those individuals. *See* 49 C.F.R. § 26.5. Pursuant to regulations adopted by the U.S. Department of Transportation, Pennsylvania has set annual goals for participation by DBEs in highway construction projects throughout the state. Thus, when bidding for state highway construction projects involving federal funds, a general contractor must ensure that the subcontracts awarded in connection with such projects meet the DBE participation goal for that project. Any DBE awarded a contract must perform a commercially useful function—that is, the DBE must perform, manage, and supervise the subcontract work and must order and pay for the materials used. *See* 49 C.F.R. § 26.55(c)(1).

Each Defendant entered a guilty plea to an information charging one count of conspiracy to defraud and commit mail fraud in violation of 18 U.S.C. § 371. Additionally, Defendants Cruz and Hubler entered guilty pleas for one count of filing a false income tax return in violation of 26 U.S.C. § 7206(1).[1] Specifically, each Defendant admitted to knowingly and willfully participating in a scheme to defraud the U.S. Department of Transportation ("USDOT"), the Federal Highway Administration ("FHWA"), and the Pennsylvania Department of Transportation ("PennDOT"), and various general contractors by using Marikina as a pass-through DBE that would be listed as performing subcontract work on various projects when in reality the work was done in whole or in substantial part by SPI and/or CDS employees.

The fraud in question spanned a period of fifteen years from 1993 through 2008. During this time, Marikina received 336 subcontracts worth approximately $119.4 million, making it PennDOT's largest recipient of DBE-designated funds. These subcontracts were awarded to Marikina by general contractors who PennDOT had awarded the prime contract to perform federally funded highway construction work in Pennsylvania, and they generally called for Marikina to "furnish and install" bridge beams. Most of these bridge beams were manufactured by SPI, but some required Marikina to install non-SPI products.

Applicable federal regulations allowed general contractors to count the entire DBE contract amount, including the costs of supplies and materials obtained by the DBE even if the suppliers of the materials were non-DBE entities, toward the general contractor's DBE goal. *See* 49 C.F.R. § 26.55(a)(1). Thus,

---

[1] The loss with respect the Defendant Hubler's tax charges is not in dispute, and although Cruz objected to the Government's loss calculation with respect to his tax charges, the Government represented in their memorandum that the parties have reached an agreement concerning that amount. (*See* Doc. 34, Gov't's Mem. Re. Loss at 3, n.3.)

despite the fact that for any given contract the cost of materials may make up the majority of the contract amount, the entire contract amount could be credited towards the general contractor's DBE goal if the DBE performed a commercially useful function.

Here, Defendants admitted at their guilty pleas that Marikina did not perform a commercially useful function in connection with any of the PennDOT DBE subcontract. In reality, the subcontracts were actually found, negotiated, coordinated, performed, managed, and supervised by SPI and CDS personnel, including Campbell and Hubler. Furthermore, upon receiving payment from the general contractor, Marikina remitted all of the funds to SPI if an SPI beam was used. If a non-SPI beam was used, Marikina paid the third-party for the beam and then remitted the balance of the funds to SPI. SPI would then kick-back a fixed amount to Marikina. Thus, with every contract which listed Marikina as the DBE, all of the work and all of the money (except some of the materials and the Marikina fixed fee) would go to SPI and/or CDS. This scheme resulted in money that the Government intended to go to legitimate DBEs performing commercially useful functions, instead being funneled through Marikina directly to non-DBEs.

## II.      Discussion

In Defendants' respective Presentence Investigation Reports, the Government calculated the amount of loss attributable to the conspiracy to defraud and commit mail fraud to be $121 million,[2] which, pursuant to U.S.S.G. §

---

[2] The Presentence Investigation Reports state the amount of the loss as $121 million. However, at the hearing the Government presented evidence that the total value of the Marikina DBE subcontracts credited to DBE goals was $119,409,724.04. Although it does not effect the guideline range because the amount is still more than $100 million but less than $200 million and, thus, a 26-level
(continued...)

4

2B1.1(b)(1)(N), resulted in a 26-level increase to the Offense Level Computation. Each of the Defendants objected to this figure.

Specifically, Defendants argue that the Government incorrectly applied Application Note # 3(F)(ii) of U.S.S.G § 2B1.1 to determine the amount of the loss rather than Application Note # 3(E)(i), which requires the court to credit the fair market value of the property returned and services rendered to the victim. Defendants also argue that even if the court were to apply Application Note # 3(F)(ii) to determine the loss that the court should, in accordance with the Third Circuit's recent decision in *United States v. Lianidis*, 599 F.3d 273 (3d Cir. 2010), deduct from the amount of the contracts all direct costs incurred while legitimately serving a contract. The court will address each of these arguments in turn.

### B.    Application Note # 3(F)(ii)

Defendants argue that the Government applied the wrong section of the Sentencing Guidelines in calculating the loss of $119.4 million. Specifically, they argue that since this case is not a Government Benefits case that Application Note # 3(F)(ii) does not apply. The court disagrees.

Application Note # 3(F)(ii) of U.S.S.G. § 2B1.1 reads:

(F)    Special Rules. — Notwithstanding subdivision (A), the following special rules shall be used to assist in determining loss in the cases indicated:

. . .

(ii) Government Benefits. – In a case involving government benefits (e.g., grants loans, entitlement payments), loss shall be considered to be not less than the value of

---

²(...continued)
increase is applicable in either event, it does impact the amount of restitution that Defendants must pay. Because the court finds that the entire amount of the DBE contracts is the appropriate measure of loss, the court will use the lower and more precise figure of $119,409,724.04 as the measure of loss for determining the guideline range and the amount of restitution.

5

> benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.

U.S.S.G. § 2B1.1 app. note 3(F)(ii) (2008).[3]

Defendants argue that Application Note # 3(F)(ii) only applies to government entitlement programs and is inapplicable in DBE fraud cases. Defendants cite no case law directly supporting their argument and the court has found none on its own. Furthermore, the Government cites to a series of Circuit Court opinions explicitly applying Application Note # 3(F)(ii) in the context of DBE fraud cases. (*See* Gov't's Mem. Re. Loss at 9-10 (*citing United States v. Maxwell*, 579 F.3d 1282 (11th Cir 2009); *United States v. Leahy*, 404 F.3d 773 (7th Cir 2006); *United States v. Bros. Constr. Co. of Ohio*, 219 F.3d 300 (4th Cir. 2000); and *United States v. Tulio*, 263 Fed. App'x 258 (3d Cir. 2008) (unpublished opinion).)

Moreover, at the evidentiary hearing counsel for the Government convincingly argued that DBE cases are not like standard government construction contracts where the Government is always interested in selecting the lowest bidder. Instead, in DBE cases, the Government is concerned with *who* is doing the work not necessarily how much it costs, and at times the Government may be willing to pay a premium to ensure the legitimate DBEs are favored over non-DBEs. This argument is consistent with the holdings of the cases cited by the Government. *See Maxwell*, 579 F.3d at 1306 (holding that the Government Benefits provision of § 2B1.1 applies because "[u]nlike standard construction contracts, these contracts focus

---

[3] The 2008 edition of the Sentencing Guidelines were used to calculate the applicable guidelines for Defendant Cruz. The 2007 edition of the Sentencing Guidelines were used to calculate the applicable guidelines for Defendants Campbell and Hubler. The language in Application Note # 3(F)(ii) of § 2B1.1 is the same in both editions.

6

mainly on who is doing the work"); *Leahy*, 464 F.3d at 790 (holding a city minority contracting program was a Government Benefits program under § 2F1.1 before it was consolidated with § 2B1.1); *Bros. Constr. Co. of Ohio*, 219 F.3d at 317-18 (holding the fraudulent receipt of DBE funds involved the diversion of Government Benefits under the Sentencing Guidelines); *Tulio*, 263 Fed. App'x at 263 (holding Government Benefits provision of § 2B1.1 applies to DBE funded contracts).

In fact, DBE and similar programs are "affirmative action program[s] aimed at giving exclusive opportunities to certain women and minority businesses," thus making them entitlement program payments. *Leahy*, 464 F.3d at 790*; see also Bros. Constr. Co. of Ohio*, 219 F.3d at 317-18; *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 217 (2000) ("Congress has adopted a policy that favors contracting with small businesses owned and controlled by the socially and economically disadvantaged."). Thus, the court finds that Application Note # 3(F)(ii) of § 2B1.1 applies to the calculation of the loss in this case.

### B.   Total Loss vs. Net Loss

Defendants argue the even if the court applies Application Note # 3(F)(ii), the loss should not be the total value of the contracts, but rather the court should credit against the total contract amount the fair market value of the services that they provided and/or any direct costs that they incurred in providing those services. Defendants argument is premised on the language contained in Application Note # 3(E)(i), and their argument that the court should follow the Third Circuit's decision in *Lianidis* in calculating the loss in this case. Both arguments fail.

#### 1.   Application Note # 3(E)(i)

Defendants' argument that Application Note # 3(E)(i) applies is misplaced. That section directs the court to reduce the loss by "the money returned,

7

and the fair market value of property returned and the services rendered, by the defendant . . . to the victim before the offense was detected. . . ." U.S.S.G. § 2B1.1 app. note 3(E)(i). Defendants did not return their ill-gotten gains in this case prior to the fraud being discovered; instead, they argue that since all of the work was complete per the government contracts in a workmanlike manner, and the offense was not discovered until after the completion of the projects, that the credit against loss should nonetheless apply.

In support of their proposition, Defendants cite *United States v. Rothwell*, 387 F.3d 579 (6th Cir 2004). In *Rothwell*, a contractor applied for and received a Small Business Administration ("SBA") loan to rebuild certain property. The contractor filed false progress reports with the SBA, and obtained loan proceeds to which he was not entitled, which he then used on another property. Ultimately, the contractor used non-SBA loan proceeds to finish construction on the original property. The Sixth Circuit determined that the contractor was entitled to a credit and a loss calculation of zero. Specifically, the court held that "[b]ecause the expenditures on the project exceeded the amount envisioned under the loan agreement, Rothwell returned or replaced the money he improperly obtained before the offense was detected and is thus entitled to a credit equal to the amount of the replacement funds." *Id.* at 585.

*Rothwell* is inapposite. First, there is no indication from the opinion that the Sixth Circuit viewed the case as a Government Benefit case to be calculated under Application Note # 3(F)(ii). Second, in this case, all of the DBE subcontracts were ill-gotten gains because Marikina was not functioning as a legitimate DBE, and therefore was not entitled to *any* of the DBE subcontract money from these contracts. Certainly, if Marikina, SPI or CDS had returned *all* of the $119.4 million before the fraud was discovered, and legitimate DBEs were awarded and performed

the contracts in their place, then Defendants would arguably be entitled to a credit under Application Note # 3(E)(i). That, however, did not happen. Thus, the court concludes that Defendants are not entitled to any credits pursuant to Application Note # 3(E)(i) against the total loss.

### 2. *Lianidis*

In *United States v. Lianidis*, 599 F.3d 273 (3d Cir. 2010), the defendant owned a business that bid on governmental computer system projects. The defendant bribed a government official to fraudulently secure the project; however, although the contracts were procured by fraud the defendant's actual work was legitimate. In assessing the loss to the Government, the Third Circuit analyzed U.S.S.G. § 2C1.1(b)(2), the section of the guidelines dealing with loss calculations in bribery cases, and correctly stated that the amount of the loss is to be determined based on the greater of the loss to the Government or the value of "the benefit received or to be received" in return for the bribe. *Id.* at 278 (quoting U.S.S.G. § 2C1.1(b)(2).

The Third Circuit's decision centered largely on interpreting the scope of this phrase in § 2C1.1(b)(2) and the corresponding application note, which states that the "value of benefit received" means the "net value" of such benefit. *Id.* Ultimately, the court determined that in bribery cases the loss should be calculated by determining the value to the entity who was the recipient of the ill-gotten contract and then subtracting all direct costs, which are the costs associated with performing the contract such as transportation costs or other costs that can be readily apportioned to the contract. *Id.* at 281.

Defendants argue that the court should be guided by *Lianidis* in reaching its loss calculation in this case. The court disagrees. First, the section of the sentencing guidelines at issue in *Lianidis* is not implicated here. The

Application Note to § 2C1.1(b)(2) specifically defines "value of benefit received" as "net value," a qualifier that does not appear in Application Note # 3(F)(ii) to U.S.S.G. § 2B1.1. Moreover, nowhere in *Lianidis* does the Third Circuit suggest that its decision should be read to broadly include loss calculations from other sections of the U.S. Sentencing Guidelines not discussed by its opinion.

Second, the language of Application Note # 3(F)(ii) plainly instructs the court to determine the loss as that which is "not less than the value of the benefits obtained by the unintended recipients." Furthermore, while the example given in this application note guides the court to deduct from the loss any benefit the recipient was intended to receive it does not make allowance for any other deductions. When the facts of this case are examined, it is easy to see why deducting direct costs from the amount of the loss would understate the seriousness of the offense.

Here, the Government paid $119.4 million to Marikina who performed no commercially useful function in fulfilling the contracts. Instead, it simply served as a pass-through for all of the money to SPI and/or CDS, non-DBEs. The total amount of the contracts went to unintended recipients, and neither USDOT nor PennDOT got the benefit of its bargain, which included not only getting road construction projects performed in a workman-like manner but also included benefitting socially and economically disadvantaged businesses.

Loss calculations under the Sentencing Guidelines attempt to reach the appropriate sentence by "quantifying the amount of harm wrought against the victim–here the government–by a particular criminal act." *United States v. Tupone*, 442 F.3d 145 154 (3d Cir. 2006). In cases like this one, the court finds that the proper loss calculation under the U.S. Sentencing Guidelines "is the difference between the amount of benefits actually obtained by a given defendant and the

amount the government intended [it] to receive during the relevant period." *Id.* Here, the Government intended all of the benefits of its DBE contracts to go to legitimate DBEs performing commercially useful functions, and none of the benefit to go to sham-DBEs serving only to enrich itself and other non-DBE entities. Accordingly, the court finds that the appropriate measure of the loss in this case is the total amount of the subcontracts that were intended to go to legitimate DBEs.

At the hearing, the Government established by a preponderance of the evidence that the total value of the subcontracts that went to Marikina and were credited toward DBE goals was $119,409,724.04. This is the amount of the loss in this case.

### III. Conclusion

In accordance with the foregoing, the court will overrule Defendants' objections to the loss calculations and finds, pursuant to Application Note # 3(F)(ii) of U.S.S.G. § 2B1.1, that the loss in this case is $119,409,724.04. An appropriate order will follow.

s/Sylvia H. Rambo<br>
United States District Judge

Dated: June 30, 2010.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : CRIMINAL NO. | 1:CR-08-007 |
| v. | : | |
| **DENNIS CAMPBELL** | : | |

___

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : CRIMINAL NO. | 1:CR-08-129 |
| v. | : | |
| **TIMOTHY G. HUBLER** | : | |

___

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : CRIMINAL NOS. | 1:CR-08-318<br>1:CR-08-465 |
| v. | : | |
| **ROMEO P. CRUZ** | : | |

___

## **O R D E R**

In accordance with the attached Memorandum of Law, **IT IS HEREBY ORDERED THAT** Defendants' objections to the Government's loss calculation contained in Defendants' Presentence Investigation Reports are **OVERRULED**. The court finds that the loss attributable to Defendants' fraud is $119, 409,724.04. The court will issue a separate order scheduling sentencing.

                                                         s/Sylvia H. Rambo
                                                    United States District Judge

Dated: June 30, 2010.